**WALLER BROTHERS STONE COMPANY, Plaintiff-Appellee,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, DISTRICT 23; Local 134, United Steelworkers of America, AFL–CIO–CLC; Paul D. Rusen; Roby Fraley; Clinton Piatt; Lonnie G. Miller; Leonard Stacy; Everett G. Crabtree; Archie Brown; Warren Stephens; Robert C. Crabtree; and T. J. Crabtree, Defendants-Appellants.**

No. 79–3254.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 8, 1979.

Decided April 29, 1980.

Rudolph L. Milasich, Jr., United Steelworkers of America, Pittsburgh, Pa., James B. Robinson, Smith & Kircher, Cincinnati, Ohio, Bernard Kleiman, Chicago, Ill., for defendants-appellants.

J. Mack Swigert, Taft, Stettinius & Hollister, Cincinnati, Ohio, for plaintiff-appellee.

Before CELEBREZZE and ENGEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

ENGEL, Circuit Judge.

The United Steelworkers of America appeals from a preliminary injunction issued in the district court prohibiting the union from striking over the wage rate to be paid certain employees of Waller Brothers Stone Company, who operate a newly installed "Instapak" machine. In issuing the injunction the district judge relied upon the *Boys Markets*[1] exception to the anti-injunction provisions of the Norris-LaGuardia Act. The union claims that the right to strike over wage rates was expressly reserved in the collective bargaining agreement and that, therefore, the injunction was improvidently issued. We conclude that the union's express reservation in the contract of its right to strike in the event of a dispute over wages, properly construed in the context of the entire agreement, forbids application of the relatively narrow *Boys Markets* exception to the Norris-LaGuardia anti-injunction statute in this case. Accordingly, we reverse and remand for vacation of the injunction.

I.

The underlying dispute in this case arose when Waller Brothers, which operates a stone quarry engaged in removing and processing stone and packing the stone in boxes for shipment, purchased an "Instapak" machine, which sprays protective padding around the stone being packed for shipment. Before the purchase of the "Instapak" the stone was packed with strips of synthetic material as padding. Employees called "Craters" pack the stone for shipment. The union claims that it was entitled to negotiate a new wage rate for an "Instapak" machine operator, while the company maintains that the operation of the machine is only a function of the "Crater" job classification which is subject to a previously negotiated wage rate. The company takes the position that both the no-strike clause and the provision for mandatory grievance arbitration contained in the collective bargaining agreement apply to this dispute. The union for its part relies upon that por-

---

1. *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

tion of the contract which provides that wage rates are not subject to arbitration and that the union expressly reserves the right to strike in the event of a disagreement on wages. While the position of each party is necessarily technical and while each party relies upon competing and conflicting interpretations of the contract, we observe at the outset that the positions of each are at least rational and find some reasonable support in the document which the parties have executed.

The preliminary injunction entered by the district judge prohibits any strike "unless and until an arbitrator has ruled that such rate is negotiable pending the further order of this court." The judgment also directs the parties upon the prompt written request of the defendant union "to refer the pending grievance issue relating to the work in question to an arbitrator in accordance with the fourth step of the grievance procedure which was set forth in Article VI of the applicable bargaining agreement," requiring as a condition to the injunction's issuance that the company post a $5,000 cash bond.

## II.

The collective bargaining agreement between the parties generally requires mandatory arbitration of all disputes and forbids all strikes by the union. An exception to this general rule is that disputes over wage rates are not subject to arbitration, and can be the basis for a legal strike. Specifically, the grievance procedure, set forth in Article VI, Section 1 of the applicable 1977 Agreement provides as follows:

It is agreed that should any difference of any nature arise between the Company and the Union, or any member of the Union, there shall be no suspension of work because of such difference, but an earnest effort will be made to settle such differences in the following manner:

FIRST: Between the aggrieved employee and/or a committeeman and the foreman of the department.

SECOND: Between the Grievance Committee and the Management . . . .

THIRD: Between the Grievance Committee and the International Representative of the Union (or of the AFL–CIO) and the company or its representative. . . .

FOURTH: Should the above procedure fail to bring about a satisfactory settlement, then the dispute shall be referred to an arbitrator agreed upon by the Company and the Union . . . . *Wage rates shall not be subject to arbitration, but the Union expressly reserves the right to strike in the event of a disagreement on wages.*

(Emphasis added)

Article IX of the collective bargaining agreement specifically addresses the subject of wages. Article IX, § 6 provides:

Section 6. A schedule "A" containing the rates for the different job classifications shall be attached hereto and shall be an integral part of this agreement, subject to any cost of living increases provided for in Section 7 below.

The wage rate for the Crater job is set at $4.89 per hour in Schedule A. Section 8 of Article IX provides:

Section 8. Wage rates not shown in Schedule "A" shall be a matter for negotiations between the Company and the Union. When a satisfactory rate cannot be agreed upon, the Union expressly reserves the right to strike without being deemed in violation of this agreement.

The company interprets sections 6 and 8 of Article IX as a limitation on the union's right to strike over wage rates. The company contends that it is only those wage rates not specified in Schedule A over which the union may strike. Thus the union may not strike over the Crater's wage rate, which is specified in Schedule A. The second step in the company's argument is that since the union cannot strike over the wages to be paid for the Crater job, the underlying dispute between the parties is whether the Instapak machine operators are performing the Crater job.

The union, however, asserts that it has the right to strike over any and all wage rates. The explanation proffered by the union for the co-existence of the Article VI provision granting the right to strike over wage rate disputes, and the Article IX provision that wage rates not specified in Schedule A may be the subject of a strike, is as follows:

> Here, there is no *conflict* between the two clauses because both clauses reserve affirmatively the right to strike. Nor are the clauses redundant. While each one is an exception to the general pledge of not striking during the grievance and arbitration process, each clause creates a different exception. Thus, Article IX, Section 8, applies to wage rate disputes involving jobs or rates which are not listed in Schedule "A" and gives the Steelworkers the right to strike immediately without having to wait until the steps of the grievance procedure short of arbitration have been exhausted. The reservation of the right to strike in Article IV [sic VI], Section 1, Fourth, applies to all disagreements on wages, including those involving jobs or rates not listed in Schedule "A" but that right to strike does not become operative until after the lower steps of the grievance procedure have been exhausted.

Thus, the proper interpretation of Article IX underlies the entire controversy between the parties. The company's interpretation of Article IX is crucial to its position, for if Article IX does not limit the reserved right to strike over wage rates, the union, under Article VI, could strike over the wage rate paid to the person performing the Crater job, the Instapak job, or any job at any time, regardless of the job title or the addition of new machinery.

In short, the "function and scope of the Crater job" the matter which the district court and the company perceive as the dispute in question, is only relevant if Article IX limits the Article VI reserved right to strike over wage rates not specified in Schedule A. If Article IX does not so limit the right to strike, the union could strike regardless of the appellation given the operator of the Instapak machine.

If the company is correct in its interpretation of Article IX, then the scope of the Crater job clearly does present an arbitrable question. However, an arbitrator's resolution of this question will not necessarily end the dispute. If an arbitrator decides that operation of the Instapak machine is not within the definition of the Crater job, and therefore not within Schedule A, then the union will be able to strike over the wage rate for that job even under the company's interpretation of the contract.

### III.

In *Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that anti-strike injunctions could be issued in a limited class of cases despite the literal terms of section 4 of the Norris-LaGuardia Act prohibiting such injunctions. The holding in *Boys Markets* was by the Court's own admission "a narrow one." 398 U.S. at 253, 90 S.Ct. at 1593. The majority construed a no-strike obligation as the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. 398 U.S. at 248, 90 S.Ct. at 1591. Thus, the decision in *Boys Markets* merely authorized the federal courts to enforce the interdependent terms of the collective bargaining agreement negotiated by the parties.

The congressional policy favoring arbitration recognized by the Supreme Court in *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 71 S.Ct. 923, 1 L.Ed.2d 972 (1957), and in the *Steelworkers Trilogy*[2] does not reflect a congressional policy favoring the issuance of anti-strike injunctions pending arbitration. In fact, the Norris-LaGuardia

---

2. *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358,

4 L.Ed.2d 1424 (1960); and *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

Act sets up in clear language the countervailing congressional policy that court employment of the injunctive process to prevent the exercise of the right to strike is normally not favored. An accommodation between these two conflicting policies was drawn in *Boys Markets* to meet a specific problem. The Court in *Boys Markets* reasoned that "employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking." 398 U.S. at 252, 90 S.Ct. at 1593. The Court concluded that the availability of enforcement procedures for only one half of the bargain presented a "serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, [and] that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy." 398 U.S. at 253, 90 S.Ct. at 1594.

However, as the Supreme Court emphasized in *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the fact that a strike may arguably violate the provisions of the collective bargaining agreement, and may thus present an arbitrable issue does not justify the issuance of a *Boys Markets* injunction. Writing for the Court in *Buffalo Forge,* Mr. Justice White observed:

> Here the Union struck, and the parties were in dispute whether the sympathy strike violated the Union's no-strike undertaking. Concededly, that issue was arbitrable. It was for the arbitrator to determine whether there was a breach, as well as the remedy for any breach, and the employer was entitled to an order requiring the Union to arbitrate if it refused to do so. . . . However that may be, it does not follow that the District Court was empowered not only to order arbitration but to enjoin the strike pending the decision of the arbitrator, despite the express prohibition of § 4(a) of the Norris-LaGuardia Act against injunctions prohibiting any person from

> "[c]easing or refusing to perform any work or to remain in any relation of employment."

428 U.S. at 410, 96 S.Ct. at 3149. As Judge Lively succinctly summarized in *Complete Auto Transit v. Reis,* 614 F.2d 1110 at 1113 (6th Cir., 1980):

> [T]he mere fact that a strike may be illegal is not sufficient to empower a federal court to enjoin it. Norris-LaGuardia withholds jurisdiction to grant an injunction unless the case comes within the "narrow" exception established in *Boys Markets.* . . . Only if the underlying dispute—the one "over" which the workers are striking—is arbitrable, will the *Boys Markets* exception permit a federal court to enjoin a strike.

*See also Southern Ohio Coal Co. v. United Mine Workers,* 551 F.2d 695, 704 (6th Cir.), *cert. denied,* 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155 (1977).

In issuing the injunction in this case the district court found simply that the "difference between the parties as to the function and scope of the 'Crater' job is . . . subject to arbitration," and that the "strike relates to an issue which is subject to binding arbitration." However the strike must not only "relate to" an issue which is subject to binding arbitration it must be "over" such an issue, and concomitantly in violation of a no-strike obligation.

The district court's hesitance to find the underlying dispute between the parties arbitrable and subject to a corresponding no-strike obligation is understandable. The decision in *Boys Markets* enabled the federal courts to enforce the bargain freely made between a union and an employer. In this case, however, the substance of that bargain is far from clear. In *Boys Markets, Buffalo Forge* and *Complete Auto Transit,* the arbitrability of the parties' underlying dispute and the effect of the dispute on the no-strike obligation was fairly clear from the collective bargaining agreements. In this case, however, these threshold questions pose difficult problems of contract interpretation. These questions cannot be

fully addressed in an action seeking a preliminary injunction. In *Buffalo Forge*, the Court emphasized that a district court should not use a *Boys Markets* injunction, intended to facilitate and encourage arbitration, to usurp the very function of the arbitrator. Mr. Justice White wrote for the Court:

> [T]he parties' agreement to adjust or to arbitrate their differences themselves would be eviscerated if the courts for all practical purposes were to try and decide contractual disputes at the preliminary injunction stage.
>
> . . . [T]his would . . . involve hearings, findings, and judicial interpretations of collective bargaining contracts. It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly pre-empted by judicial views of the facts and the meaning of contracts if this procedure is to be permitted.

428 U.S. at 412, 96 S.Ct. at 3149.

It is perhaps enough to observe that in this case the underlying dispute is inescapably over wage rates, and that the union has expressly provided in the contract that "wage rates shall not be subject to arbitration, but the union expressly reserves the right to strike in the event of a disagreement on wages." The company's argument, that the union may not strike over the wage rates specified in Schedule A attached to the contract, has some force. However, the wage rates in Schedule A are only relevant to this dispute if the Instapak machine operator is performing the "Crater" job. The scope of the Crater job classification is far from clear and the fact that this issue may in fact be arbitrable, as Judge Porter held, does not in itself render the entire wage question subject to the ban of the no-strike clause.

Where the union has expressly reserved its right to strike over certain issues, a *Boys Markets* injunction should not issue unless it clearly appears to the trial judge that the dispute which underlies the strike is subject to a no-strike obligation. Under the circumstances which exist here, the issue is so greatly in doubt that we believe that it was an abuse of discretion to issue an anti-strike injunction in the face of the literal ban of the Norris-LaGuardia Act and the narrow construction which the Supreme Court and our circuit have placed upon the *Boys Markets* rule.[3]

Accordingly, the preliminary injunction entered by the district court is vacated and the cause remanded for further proceedings.

---

**3.** In view of our limited holding here, we have concurrently denied the union's motion to supplement the record on appeal by adding the subsequently issued decision of the arbitrator.